[No. 30835. *En Banc.* December 14, 1949.]

THE DEPARTMENT OF TRANSPORTATION *et al., Appellants,* v. SNOHOMISH COUNTY *et al., Respondents.*[1]

*The Attorney General, John Lindberg,* and *Phil H. Gallagher, Assistants,* for appellant department of transportation.

[1]Reported in 212 P. (2d) 829.

*Thomas Balmer, A. J. Clynch,* and *R. Paul Tjossem,* for appellant Great Northern Railway Company.

*Little, Leader, LeSourd & Palmer,* for respondents.

ROBINSON, J.—On March 17, 1947, the director of the department of transportation of the state of Washington made an order closing the grade crossing of Park avenue in the town of Mukilteo, in Snohomish county, to vehicular traffic over the tracks of the Great Northern Railway Company. The superior court of Washington, for Snohomish county, issued a writ of review. In response to the writ, the department certified to the court a transcript of oral testimony, taken at a hearing conducted by it prior to the making of an order; also, the exhibits introduced in evidence, its findings of fact, and the closure order of March 17. After considering the oral testimony given at the departmental hearing and the exhibits then introduced, the superior court made findings of fact and conclusions of law, and entered a judgment reversing the order made by the department of transportation and directing it to dismiss the petition of the Great Northern Railway Company and enter an order directing the company forthwith to reopen the grade crossing to vehicular traffic. The department and railway company have appealed from that judgment.

Before considering this appeal on the merits, we must pass upon the contention made by the appellants in their opening brief that the superior court did not have jurisdiction to review the order of the department. That contention seems to be made upon the theory that the review of the closure order of the department of transportation was, in effect, an action against the state of Washington and governed by Rem. Rev. Stat., § 886 [P.P.C. § 933-1]. In the actions therein provided for, the plaintiff is required to file a surety bond to indemnify the state as to costs, and no such bond was filed in this cause. However, we think that the review of the departmental order sought in this proceeding was applied for pursuant to Rem. Rev. Stat. (Sup.), § 10523 [P.P.C. § 824-21], Laws of 1937, chapter 22, Railroad and

Highway Crossings, pp. 59-60, § 6, wherein it is provided that orders of the public service commission may be reviewed in the superior court of the county wherein the crossing involved is situated. However, there is no provision that a bond for costs shall be required in petitioning for such a review.

The order involved in this case was not, strictly speaking, made by the public service commission but by a division of the department of public works which succeeded to the powers and duties of the public service commission and is itself composed of three divisions, (1) "the division of transportation," (2) "the division of public utilities," and (3) "the division of highways." Rem. Rev. Stat., § 10779 [P.P.C. § 239-1], Laws of 1921, chapter 7, § 21, p. 18. The order which was reviewed by the superior court of Snohomish county was issued by the department of transportation, which will hereinafter be referred to as the department. Since the order involved a crossing situated in Snohomish county, we hold the superior court of that county had jurisdiction to review it, although no cost bond was filed with the petition for review.

By virtue of Rem. Rev. Stat. (Sup.), § 10523, Laws of 1937, chapter 22, § 6, p. 59, the superior court, in making such a review, is authorized to consider the reasonableness and lawfulness of the order under review, and the statute also authorizes the appeal to this court from the judgment entered on review.

We will, therefore, consider this matter on the merits. In so doing, we will keep in mind that the trial court was also a reviewing court and, as such, did not see the witnesses or hear them testify, and had to reach its conclusions from a transcript of the oral evidence given at the departmental hearing and the exhibits submitted therein. We also must review the judgment appealed from upon the same evidence and exhibits, and are, therefore, not required to give the findings of the trial court the same weight which we ordinarily give when a case is tried before the court without a jury and the trial court sees and hears the witnesses.

Laws of 1937, chapter 22, p. 50, is an act of which the short title is: "Railroad and Highway Crossings." By § 2 of that act, currently codified as Rem. Rev. Stat. (Sup.), § 10514 [P.P.C. § 824-7], the legislature delegated very wide powers to the public service commission with regard to railroad and highway crossings, and those powers are now vested in the department of transportation. The department is authorized to establish under crossings or grade crossings, or to change the location of an existing highway or crossing, or to cause the closing or discontinuance of an existing highway crossing and divert the travel thereon to another highway or crossing, or, if not practicable, to change such crossing from grade, or to close and discontinue the crossing and open an additional crossing for the partial diversion of travel; and these powers are now vested in the department of transportation. In short, the department is given wide powers to rearrange the traffic over or under railways by closing certain crossings and opening others, and may even change the locations of the highways themselves.

When an application is made to the department to close a grade crossing, as was done in this matter, the department is required to fix a time and place of hearing and give notice to all parties who may be presumed to be affected thereby. After the hearing, the department must make and file its written findings of fact concerning the matters inquired into and enter its order based thereon, specifying any changes to be made by way of closing the grade crossing or establishing an under crossing or over crossing at the grade crossing, or the highway may be closed at the crossing point and the travel diverted through another channel. The whole purpose of § 2 of the railroad and highway crossing act (Laws of 1937, chapter 22, p. 50; Rem. Rev. Stat. (Sup.), § 10514) is to promote the public safety. In enacting it, the legislature was merely reaffirming a long-established legislative policy.

In *Reines v. Chicago, M., St. P. & Pac. R. Co.*, 195 Wash. 146, 150, 80 P. (2d) 406, a case decided in 1938, this court said, in part:

*"The statute law of this state relating to grade crossings has for many years been based upon the theory that all grade crossings are dangerous, and administrative commissions have existed for many years with extensive powers of regulation.* As early as 1909 an act was passed providing that all railroads, or extensions thereof thereafter constructed should cross all existing railroads and highways by passing under or over, unless authorized to do otherwise by consent of the railroad commission. Laws of 1909, chapter 162, p. 618. Subsequent legislation provided that towns and counties or the state highway commissioner might, upon allegations that the public safety required it, petition for the elimination of existing grade crossings and a substitution of under or over crossings, and provided for the machinery for carrying that purpose into effect, including the right of eminent domain. Laws of 1913, chapter 30, p. 74; Laws of 1921, chapter 138, p. 494.

"Ever since 1909, the railroad commission, or the successor to its powers and duties, has had the power and duty to require any railroad to install and maintain proper signals, warnings, or other devices to warn and protect the public at any highway crossing. Rem. Rev. Stat., § 10513 [P.C. § 5640]. Additional and later legislation (1931) provides that railroads must install the sawbuck crossing signs, with the lettering 'Railroad Crossing,' at all grade crossings and 'additional safety devices and signs may be installed at any subsequent time when required by the department of public works.' Rem. Rev. Stat., § 6308-2 [P.C. § 2691-2], subd. (b)." (Italics ours.)

In the instant matter, the department strictly followed the procedure required by the statute. It fixed August 22, 1946, as the date of hearing. It served notice of the date and place of hearing on the petition, and also gave notice of the time and place of hearing to the commissioners of Snohomish county, and posted such notices at several places in the county. It further published notices in the Everett Daily Herald, and otherwise notified a number of persons known to be interested in the matter. Many of the residents of Mukilteo and its environs appeared at the hearing, as well as a number of persons from other parts of the county, including Everett. All persons in attendance, who desired to testify, were permitted to do so. Nineteen testified, and a

stenographic record was made of their testimony. That record and eleven exhibits introduced at the hearing were before the trial court on review, and are, of course, a part of the record before us.

On March 17, 1947, the department filed comprehensive findings of fact, to which was appended the following order:

"WHEREFORE, IT IS ORDERED That the Park Avenue crossing be, and the same hereby is, closed to vehicular traffic.

"IT IS FURTHER ORDERED That the Great Northern Railway Company take such steps as are necessary to accomplish this closure.

"Dated at Olympia, Washington, March 17, 1947 and effective five days after date.

"DEPARTMENT OF TRANSPORTATION OF WASHINGTON
PAUL REVELLE
Director"

The department entered comprehensive findings of fact, and, in so doing, gave a thorough description of the physical features involved and a careful digest of the evidence given at the trial. Because of the length of these findings, we cannot fully state them in this opinion. However, we think a partial quotation from them should be included, as follows:

"Mukilteo is an unincorporated community located on Possession Sound between Seattle and Everett. The tracks of the Great Northern Company pass through Mukilteo in a general easterly-westerly direction. Park Avenue in Mukilteo crosses these tracks in a general northerly-southerly direction. At this crossing there are two main line tracks, a passing track and another track leading to a switch going to the government holdings on a dock located in Mukilteo. It is this crossing which the railway company is seeking to close.

"Approximately 500 feet west of this crossing is located a highway overpass. This overpass was built by the State Department of Highways as a Federal Aid project. Prior to the time this overpass was completed in 1941, Park Avenue was the only means of getting from the north part of Mukilteo to the south part of Mukilteo. During part of the war years the Park Avenue crossing was closed to vehicular traffic at the request of the U. S. Army. Secondary State Highway 1-I runs from a point between Everett and Seattle on U. S. Highway 99 to and across the above mentioned

overpass. At Second Street in Mukilteo an extension of Highway 1-I goes in an easterly-westerly direction to Park Avenue, turns north for one block on Park, and at a point approximately ½ block south of the crossing turns in an easterly direction to Everett. Those persons desiring to travel between Everett and Seattle may do so without crossing the railroad crossing herein involved. Persons traveling between Everett and Mukilteo via Highway 1-I may do so in one of two ways: They may either use Second Street and the over-crossing, or they may use the Park Avenue crossing.

"Park Avenue, north of the crossing, is approximately two blocks in length. Located upon the west side thereof are some of the community's principal businesses. Other businesses are located on Front Street which intersects Park Avenue two blocks north of the crossing; also on Front Street is located the ferry dock which is used by ferries operating between Mukilteo and Whidby Island. To the south of the crossing on Park Avenue is the fire station, the post office and other important portions of the community.

. . .

"No traffic count was made as to the amount of vehicular traffic crossing the railroad tracks; however, evidence was adduced as to the amount of train travel at the intersection. During the month of July, 1946, the schedule of the Great Northern Railway Company shows that 12 eastbound trains and 12 westbound trains are scheduled to cross the intersection each day. During the month of July, 246 eastbound passenger trains, and 129 eastbound freight trains crossed this intersection. During the same period of time, 236 westbound passenger trains, and 136 westbound freight trains crossed the intersection. The total number of trains, therefore, crossing Park Avenue during the month of July, 1946, was 747.

"The maximum permissible speed, as set by the railroad company, for passenger trains is 60 miles per hour, and for freight trains it is 50 miles per hour. Some of these trains go at the maximum speed at the crossings.

"No evidence was adduced by petitioner as to the fact of there ever having been any serious accidents involving automobiles and trains at this crossing. On the other hand, evidence was given by persons who had lived in the vicinity for a number of years that there had been no serious accidents. In spite of this record of no serious accidents, however, the department specifically finds that the grade cross-

ing of Park Avenue and the Great Northern Railway tracks in Mukileteo is an exceedingly dangerous crossing because of the following factors: the grade of Park Avenue south of the railway tracks which, particularly in icy or wet weather, could cause northbound motor vehicles to slide onto the tracks, or southbound vehicles to slide backwards onto the tracks, the poor visibility available to motorists approaching the tracks, the number of trains using the tracks, and the speed with which these trains travel over this crossing. It is to be noted here that Mukilteo is not an incorporated city or town; therefore, the railroad company is under no obligation to reduce the speed of its trains.

"Having found that the grade crossing herein is dangerous and unsafe, we must also consider the convenience and the necessity of those using the crossing and whether the need of the crossing is so great that it must be kept open notwithstanding its dangerous condition. A great deal of the evidence of various persons opposed to the closing of the crossing was directed to this proposition. As has been before stated in these findings, prior to the completion of the overpass west of the crossing, the crossing at Park Avenue was the only way in which persons could travel from one part of Mukilteo to the other. The overpass was constructed as a Federal Aid Project with the view of eliminating the crossing at Park Avenue. From all of the evidence it must be found that the overpass is not wide enough to allow free and unrestricted passage during seasons of the year when persons are traveling in great numbers upon the Mukilteo-Whidby Island Ferry. During the summer months, particularly on week-ends, it is very often the case that a line of cars is parked upon the overpass and on up the road beyond Fifth street, while other cars are moving from the ferry on to the overpass. As before stated the fire station for Mukilteo is located south of the railroad tracks, whereas a good portion of the business district is located north of the tracks. At the fire station is a pulmotor for use in resuscitating victims of drowning accidents. The beaches are also located north of the railroad tracks. It is possible with proper policing for fire equipment to use the overpass even during periods of great ferry travel. The cars coming off the ferry could be stopped and if the cars waiting to go onto the ferry were spaced so as to leave the access streets open and the center of the overpass open, the fire truck could proceed from the station on Second Street to the intersection of Second Street and the highway lead-

ing to the overpass, thence across the overpass, and thence to Front Street. A fire truck has the right of way in case of an emergency. If other users of the road traversed by the fire truck obey the law, there is access from the south side of the railway tracks to the north side. If other motorists disobey the law, and if they are not properly policed to provide sufficient space for the fire truck, the fire truck would have no way of going from the south portion of Mukilteo to the north portion. This department cannot make findings based upon the assumption that motorists will not obey the law. We must find, therefore, that the overpass provides access from the southern portion of Mukilteo to the northern portion for emergency vehicles. As to ordinary vehicular traffic, there is no great inconvenience in using the overcrossing rather than the grade crossing. The distance is not so great as to justify a finding that it would be not in the interest of the public to close the Park Avenue crossing to vehicular traffic.

"As to pedestrian traffic a different situation exists. To a pedestrian the greater distance which would have to be traversed in going from the south portion of Mukilteo to the north portion would be quite inconvenient. Furthermore, the matter of visibility at the crossing, and the grade of Park Avenue at the crossing would not be factors causing danger to pedestrians nor to the trains. The department specifically finds, therefore, that the public interest will not be served by closing the Park Avenue-Great Northern Railway crossing to pedestrian traffic.

"It is contended by residents of Mukilteo that the closing of this crossing would damage business property due to the fact that the closing of the crossing would result in making the north portion of Park Avenue a dead end street. The department has no jurisdiction to consider damage to property as such. Other remedies may be provided by law to compensate owners for damage to property, if any. The department may only consider whether or not convenience and necessity justifies the closing of the crossing. It would be convenient for the residents of Mukilteo for this crossing to remain open. However, because of the overpass there is no necessity for it to remain open.

"No evidence was adduced as to whether or not an overpass or an underpass would be feasible at Park Avenue. Because of the grade of Park Avenue, it is obvious that a highway underpass would not be feasible. A highway overpass would probably do more damage to business and busi-

ness property on Park Avenue than a complete closure because of the fact that the overpass would extend so far into the north portion of Park Avenue. No evidence was adduced as to whether improvements could be made to the existing crossing other than that some structures adjacent to the crossing could be removed. This would not, however, do away with the steep grade on the southerly portion of Park Avenue. As to installing signals or gates or having a watchman on duty at the crossing, signals are already in operation and neither a watchman nor gates would make this crossing safe, principally because of the steep grade of Park Avenue south of the crossing.

"Having considered all of the evidence adduced at this hearing, and having in mind that the general policy of the law of the State of Washington is against the establishment or maintenance of grade crossings, the department finds that public safety requires the closing to vehicular traffic of Park Avenue where it crosses at grade the Great Northern Railway tracks in the community of Mukilteo in Snohomish County."

Extensive as the above quotation of findings is, we have omitted a great part of the findings of fact, consisting largely of the data as to the distances from which drivers of vehicles approaching the crossing can see an approaching train or whether there is a train actually on the crossing.

In reviewing the findings entered by the department, the trial judge held that the department rightly found that the crossing was dangerous, but refused to concur with the departmental finding that it was *exceedingly* dangerous

Despite the fact that both the department and the reviewing court found from the evidence that the crossing was dangerous, the respondents insistently contend that the evidence did not so prove, basing that contention primarily upon the fact that there was unrebutted testimony to the effect that there had never been an accident at that crossing, although it had been a grade crossing for at least forty years. We are not impressed by that argument. A father, with knowledge that his ten-year-old son constantly attended the so-called western movies, would hardly be considered prudent if he persisted in permitting a loaded pistol to lie around the home, on the theory that there was

no danger in so doing since the boy had not yet shot anyone while playing with it. In our opinion, the evidence primarily established that the crossing was potentially dangerous. That was the major point with which the department was concerned.

■ As hitherto shown, many of our statutes are based upon the theory that all grade crossings are dangerous, and from time to time the power to close them has been delegated to various commissions, not to the courts. Furthermore, we have consistently held that the courts should not, without grave cause, interfere with the orders of such commissions, such as the public service commission, the department of public works, or the department of transportation. In *In re Stolting,* 131 Wash. 392, 230 Pac. 405, the court said:

"Time and again we have held that we will not interfere with the action of the department of public works on matters of this nature unless its members have acted unfairly, arbitrarily or in disregard of the testimony. [Citing a long list of cases.] There is nothing in this case to indicate that the department did not fully consider the testimony and honestly exercise its judgment. Such being the case, there is nothing for us to do but affirm the judgment, which is done."

The rule above quoted from the opinion in the *Stolting* case has since been consistently followed by this court. For example, in its opinion in *Northern Pac. R. Co. v. Department of Public Works,* 144 Wash. 47, 256 Pac. 333, the court said, in 1927, citing eight of its previous decisions:

"Lastly, it is contended that the findings of convenience and necessity are not supported by the evidence. The record shows that a large number of witnesses, well situated to speak upon the subject, testified to the contrary and with considerable detail showing convenience and necessity for the extension of service granted by the order. By a long line of decisions [citing cases], we have held that we will not interfere with the findings and action of the department of public works in matters of this kind, in the absence of a showing that the members of the department acted unfairly or arbitrarily and in disregard of the material rights of the parties interested. There is nothing here inconsistent

with the view that the department fully considered the testimony in the case and under the law exercised its honest judgment in disposing of it."

In *State ex rel. Model Water & Light Co. v. Department of Public Service*, 199 Wash. 24, 90 P. (2d) 243, decided in 1939, the court said, citing eight former decisions as authority for the statement:

"The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy. [Citing cases.]"

In 1945, in its opinion in *Taylor-Edwards Warehouse & Transfer Co. v. Department of Public Service*, 22 Wn. (2d) 565, 157 P. (2d) 309, this court reaffirmed and stated the general rule by quotation from a former decision as follows:

"In any event, it cannot be said that the department, in denying appellant's application, acted arbitrarily, capriciously, or upon a fundamentally wrong basis.

" 'Unless we can say that the order of the commission is wrong in the sense that its discretion has been arbitrarily exercised, we must, under well settled rules, say that it is not to be overcome by judicial decree. To do so would be but to substitute our own will for that of the commission, and in so doing we would in all probability trench upon some equities while declaring others.' *State ex rel. Tacoma Eastern R. Co. v. Northern Pac. R. Co.*, 104 Wash. 405, 413, 176 Pac. 539."

There can be no doubt but that the closing of the crossing caused the residents of Mukilteo considerable inconvenience, and that, if we reverse the judgment entered by the trial court, it will continue to do so. However, we agree with the appellants that proper policing will, in a great measure, tend to relieve the situation, and we think that, if it does not, relief can undoubtedly be had by a proper petition to the administrative body which is clothed with such

wide powers over railroad and highway crossings by chapter 22 of the Laws of 1937.

We find nothing in the record inconsistent with the view that the department fully considered the testimony in the case and, under the law, exercised its honest judgment in disposing of it, and we are not inclined to depart from our past decisions, and substitute our own judgment for that of the department.

The judgment appealed from is reversed and set aside, and the order of the department of March 17, 1947, will accordingly be sustained and enforced.

BEALS, MALLERY, SCHWELLENBACH, HILL, GRADY, HAMLEY, and DONWORTH, JJ., concur.

SIMPSON, C. J. (dissenting)—This controversy, in reality, is one between the Great Northern Railway Company and the people of the recently incorporated town of Mukilteo.

At a time prior to the hearing, the Great Northern Railway Company filed with the department its petition which reads as follows:

"I.

"The main line of the Great Northern Railway, double-tracked, extends in a northerly and southerly direction through the community known as Mukilteo in Snohomish County, Washington, and in said community crosses at grade a county road known as Park Avenue, which road is under the jurisdiction of Snohomish County, Washington; the said crossing being further identified as the grade crossing located at Great Northern Railway Survey Station 1617+00.

"II.

"Your petitioner alleges that the afore-described grade crossing is dangerous and unsafe and that public safety requires that the same be closed and permanently discontinued."

Just before the departmental hearing, sixty-six employees at the ammunition dock at Mukilteo, filed a protest against the closing of Park avenue "on the ground and for the reason that said road greatly 'facilitated' their means of passage to and from work, as most of the employees live in Everett or toward Everett." In addition, several property

owners and individuals doing business in Mukilteo protested and testified.

To better indicate my reasons for dissent, I give the following word picture of the community: The town, inhabited by about fifteen hundred people, is located on Puget Sound, a short distance southwest of the city of Everett. The shore line of the sound at this point extends generally in an easterly-westerly direction. That is, the community faces toward the sound looking toward the north. The town is laid out so that Front street runs parallel and close to the shore line. As the community built up and moved inland, other streets were made at block intervals running parallel to Front street, being designated numerically, one through ten, with First street a block from Front street. The streets which run north and south have been given names. Of those streets, we are here concerned with Park and Lincoln avenues. These two streets are approximately five hundred feet apart, with Park avenue being east of Lincoln. Park avenue approaches the bathing beach, and Lincoln avenue, the ferry slip. Park avenue is sixty feet in width, and is surfaced to the north and south of the railroad crossing. The crossing itself is equipped with a wigwag signal and a gong that sounds as trains approach. The grade of Park avenue north of the tracks is approximately level. South from the tracks the grade is 6.9 per cent, extending for about thirty-five feet, increasing to one of 17.9 per cent for a distance of seventy-five feet.

It is between Park and Lincoln avenues, running north and south, and Front and First streets running east and west, that the main business district of the community is situated. Park avenue between Front and First street, is considered the main street of the town.

The Great Northern Railway tracks come into Mukilteo from Everett about on a line with First street, cross Park avenue just south of First, and then cut diagonally through the community so that the tracks bisect Second street at Washington, which is the second avenue west of Park avenue. The main traveled highway, known as secondary

highway 1-I, extends parallel to the railroad tracks, from the direction of Everett, a considerable distance before Park avenue is reached, and, as testified to by one of the witnesses, the motorist looks down the tracks before the crossing and buildings are reached. In addition, a sharp turn must be made shortly before reaching the crossing, necessitating the driver to slow down. A traveler approaching from the west must also make a sharp turn before reaching the crossing, and would likewise be traveling at a slow rate of speed.

An additional fact to be considered is that, when approaching from the east, the view is unobstructed, since, as stated, the highway parallels the tracks for some distance and the motorist looks down a considerable way before the crossing and buildings are reached. The testimony of Jack Wilson, assistant fire chief of the Mukilteo fire department, showed that approaching from the north one can see east on the tracks five or six thousand yards.

An individual on the south side of the tracks, desiring to continue on to Seattle, would remain south of the tracks, but those desiring to go to Whidby Island, or into the business district of Mukilteo, would be able, on coming to Park avenue, if it were open, to turn to the right, cross the tracks and proceed to the main business district or go to Front street, turn to the left, continue to Lincoln avenue and to the ferry slip. With Park avenue closed, they would be compelled to go to Lincoln avenue, cross the overhead pass, go to Front street, and then turn east to get into the business district, or straight ahead to the ferry slip.

In 1940-41, the state constructed an overhead passage at Lincoln avenue. Section 10 of the contract for the improvement, entered into without the knowledge of the people of Mukilteo, reads as follows:

"Upon the completion of the project the Railway Company will petition the Department of Public Service of the State of Washington for an order closing and discontinuing the existing grade crossing at Railway Station 1617+00 on Park Avenue in said Town of Mukilteo, to which the Di-

rector of Highways shall lend support. On final entry of said order the Railway Company will, at its own cost and expense, remove the planks, signs and signals."

Concerning the project, Mr. Schearer, state highway district engineer testified:

"Q. Do you know whether or not there was a grade separation or grade crossing at the present location of that highway overpass bridge before it was constructed? A. No. There was no open street there at the time it was constructed except that portion right at the ferry dock. A short portion that was constructed on Front Street down to the dock. Q. But there was no crossing there down to the dock? A. No. I believe there was a platted street, but it was not open to the traffic. Q. That bridge is located at what is known as Lincoln Avenue? A. Yes, approximately on Lincoln Avenue. Q. And that is about one block west of Park Avenue, is that correct? A. Yes. Q. And then I understand that there was no public crossing of any type on Lincoln Street prior to the construction of this bridge? A. That is correct. Q. Do you know approximately what the cost of that construction of that highway bridge was? A. Well, the bridge was built as a part of an entire project. That is, some road construction was included with the bridge. And my recollection is the total cost of that project was somewhere around $100,000. The bridge proper,—I looked it up before coming here,—the final estimate for that structure and that cost was just under $26,000 just for the structure itself, not including the approaches."

Although the passage crosses the railroad in line with Lincoln avenue, it is not built as a part of that street, but simply as a portion of the project. The project itself consists of a state highway approach from the direction of Seattle to the ferry slip. This highway, of which the bridge is a part, was built without regard to the platted streets of Mukilteo, but extends from the ferry slip through the community.

Keeping in mind the description of Mukilteo as presented above, I will now analyze the evidence presented by, first, the petitioning railroad and then the respondent community in order to show that the lower court was justified in reversing the order of the department.

Mr. Burr, a Great Northern Railway division engineer, testified on behalf of the petitioning railroad concerning the dangerous aspect of the crossing. He stated that at the crossing there are two mainline tracks, a passing track, and another leading to a switch going to the government docks. Concerning obstructions to the automobile driver's view, the witness testified that there were many on both sides of the road, and on both sides of the tracks. However, a plat submitted at the hearing, showing visibility distances along the tracks in various locations on Park avenue, indicates conclusively that Mr. Burr was mistaken. This is also shown by testimony of Mr. Christopherson, the station agent, who testified as follows: (In passing, I should call attention to the fact that the depot is on the north side of the railroad, and but a short distance west of Park avenue.)

"Q. From your place of employment and in the station, that is where you work, is right at the station proper? A. Yes. Q. From that location can you see the traffic going over the Park Avenue grade crossing? A. I see most of it. Q. You have a view right out of the station windows? A. Yes, when I am working at the telegraph desk, I see most of Park Avenue cars crossing the grade crossing. Q. What hours do you work there now? A. Now it is from 7:45 a. m. until 4:45 p. m. Q. And have you observed the automobile traffic going over the Park Avenue crossing during your work down there? A. Yes, quite a bit. Q. What would you say generally as to the speed of cars that you have observed going north toward the Bay coming down the hill; what would you say their speed is? A. Well, I find that local people here know the danger here and are very careful. But I have seen strangers that—I figured they were strangers—people I have not seen before sometimes will be in a hurry for catching a ferry and they will go over there pretty fast. Q. From your observation how fast would you say they were going when you say 'pretty fast'? A. Well, over that crossing I have seen them go 30 and 40 miles an hour. Q. As you would estimate it? A. Yes, those few cars. Q. Have you ever had occasion to see cars coming from the ferry and approaching—proceeding south and going over the crossing? A. Yes. Q. About how fast would you say those cars travel, from your estimate? A. Well, most of them were going very cautiously, not very fast. Once in a

while you will see one that figures the track is clear and he will bounce over there pretty fast. That is just an occasional car. Q. Have you ever seen any cars having difficulty going over the grade? A. Yes. Q. What have you observed? A. Well, especially during the fall and the winter, cars coming over on the ferry, their cars are cold and they come up over that steep grade, that short steep hill, and their motors die and they either slip or roll back to get another start. Q. Do some of them roll back over the grade crossing proper to get another start? A. Yes. Q. And then go back and start over? A. Yes, and, to get a good start."

Frank Percival, employee of the petitioning railroad company, presented testimony concerning the train schedules and the speed of the trains. He stated that the maximum speed allowed in this area was sixty miles per hour for passenger trains, and fifty miles per hour for freights. At the time of the hearing, there was a schedule which called for twenty-four trains a day to pass over the crossing.

The record also shows that people, local and transients, coming from the east, would, in order to get into the business district, have to cross Park avenue, the main street of the community, south of the tracks, and proceed another block to Lincoln avenue, cross the overhead pass, turn to the right on Front street, and backtrack a block to Park avenue. The evidence shows that the business in this community is greatly enhanced by transients, and that the closing of the crossing would take much of the business away from the people of Mukilteo.

Other factors, perhaps more important than the business aspect mentioned above, were also related by the citizens of Mukilteo. These facts have to do with the traffic problem which is present on Lincoln avenue in relation to the use of the ferry. The undisputed testimony shows that traffic, especially in the summer, on that approach, is very heavy four days a week—Friday through Monday. The overpass is a two-lane highway. On the days mentioned, the cars awaiting the use of the ferry are lined up bumper to bumper back over the overpass for several blocks, at least to Fifth street. The evidence also shows that the ferries haul be-

tween twenty and forty vehicles, with a total capacity of sixty each trip, and that when the ferries are unloading there is a solid mass of cars on the overpass. It can be seen that this situation would be bad enough if the passage and approach were in conformity with the streets of the community of Mukilteo. At least the people in that town would be able to get into the traffic line. As it is now, it becomes nearly impossible for the people of the community to break into the line of traffic from the side streets.

In conjunction with this traffic snarl on those occasions, and the inconvenience and delay such a situation would cause the citizens of the community in traveling from their homes on the south side of the track to the business district on the north side of the track, if Park avenue is closed, there is the added fact that the community fire station is located on Park avenue south of the track. This station maintains modern equipment, and also a pulmotor. With the closing of the Park avenue crossing, the fire department in going to any part of the business district has to rely on the overpass and, with the traffic situation as it is, the citizens of Mukilteo are exposed to great danger. It should be remembered, also, that the public bathing beach in Mukilteo is at the north end of Park avenue. This beach, during the summer months, is crowded with children. With the Park avenue crossing open, both the fire fighting equipment and the pulmotor could be rushed immediately to any area, as emergencies arose. With it closed, the situation could, and probably will, arise where homes and business houses burn and people die, due entirely to the closing of Park avenue.

The assistant fire chief said that it would be impossible to get a fire truck down the overpass when it was occupied by automobiles waiting to get on the ferry. As another witness said, events such as a fire, or a person drowning, cannot be so regulated as to accommodate the traffic problem now present in the use of the overpass.

The facts, as testified to by the citizens of the community in showing their reasons for maintaining the crossing, are

supported by one of the petitioner's witnesses, Mr. Schearer, state highway department engineer, who testified:

"Q. Well, Mr. Schearer, don't you feel that in a little town of this kind, of Mukilteo, that there should be more than one approach, more than one road going in, so there is an exit so to speak for these people? A. Well, of course, that is desirable, Mr. Leader. The more entrances to the business district or any other part of the town, the more stores you have open, the more access you have for your traffic. Q. Yes. And to go in just one way and have to go out the same way is not satisfactory. A. It is not so satisfactory. Q. And if you have the fire department outside of the main business section and you have that long ferry line to try and get through, you have a very dangerous situation, do you not? A. A dangerous condition, yes. If the road was blocked it would be difficult to get through. Of course, we hope to cure that condition because we know it is indeed a problem. Q. What are you going to do to eliminate that? A. We will just make a study. We don't know what will be the final answer."

Of course, the crossing is dangerous. Every railroad crossing is dangerous. So are street intersections in our cities and towns and so are intersecting highways in rural areas. However, *THIS CROSSING HAS EXISTED FOR FORTY-TWO YEARS AND DURING THAT TIME NO ACCIDENT HAS OCCURRED UPON IT.* That it is safer than most crossings is demonstrated by the testimony of Mr. Burr, who stated:

"Q. Wouldn't the fact that you had many accidents on one crossing which you considered not a dangerous crossing speaking from an engineering standpoint, and here is another one where you had many accidents and you considered it a safe crossing; wouldn't that indicate you were mistaken in your engineering knowledge as to whether one was more dangerous than the other? A. I am basing my answer on knowledge of grade crossings between Spokane and Seattle. I know that on some crossings with the best grades we have made, that we have some of the most accidents. But I don't call them hazardous crossings. Q. So some of them where you have the best views you have the most accidents? A. Yes, some of them with the best views or grades, it depends on the location a lot. Q. So this one down here, while

you may have an obstructed view, you may have less accidents than you will on a crossing that has a regular straight of way crossing with good view? A. You may have less accidents on this than another one, yes sir."

As a matter of fact, the order of the department in closing Park avenue has not resulted in reducing a dangerous situation. Its real result has been to create a definite hazard—a real danger—which will without doubt cause loss of business and property and may result in a great loss of life.

I am fully persuaded that the individuals making up the town of Mukilteo have the best interests of themselves and the people who may visit their town at heart, and that they are more able to care for their safety than any governmental department.

The judgment of the trial court should be affirmed.