[No. 68228-3. En Banc.]
Argued June 27, 2000. Decided November 2, 2000.

ROBERT SEBASTIAN, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Petitioner*.

---

*Christine O. Gregoire, Attorney General,* and *Nancy A. Kellogg, Assistant,* for petitioner.

*William D. Hochberg,* for respondent.

JOHNSON, J. — This case involves the interpretation of chapter 7.68 RCW, the crime victims' compensation act (Act). Robert Sebastian's total uncompensated injuries exceed the maximum amount payable under the statute. The parties in this case dispute how to treat the collateral benefits Sebastian received when calculating benefits payable under the Act. The Court of Appeals agreed with Sebastian that the collateral benefits should be deducted from his total damages, rather than from the statutory cap, as the Department of Labor and Industries (Department) asserts. *Sebastian v. Dep't of Labor & Indus.,* 95 Wn. App. 121, 123, 974 P.2d 374 (1999). We affirm.

## FACTS

Sebastian was severely beaten in a criminal assault. His injuries were calculated at $43,788.54. He was granted compensation under the Act; the total amount to be paid is the matter in dispute. The maximum payout under the Act for a single injury or death is $30,000. RCW 7.68.070(13). Sebastian had already received $7,788.54 from the Social Security Administration in time-loss compensation.

Sebastian contends "benefits payable" refers to his total amount of injuries as calculated according to the Act, less the amount of Social Security compensation he received. This leaves him with approximately $36,000 in damages. The Department argues that "benefits payable" refers to

the statutory cap and Sebastian should be awarded the statutory cap minus Social Security compensation received, or approximately $22,000. The Department awarded benefits consistent with its theory.

Sebastian appealed the Department's calculation of benefits. An industrial insurance appeals judge agreed with Sebastian and ordered that he receive $30,000. On appeal, the Board of Industrial Insurance Appeals reversed, ordering that Sebastian receive approximately $22,000. Sebastian appealed to the superior court, where both parties moved for summary judgment. The Department prevailed. Sebastian appealed to the Court of Appeals, which reversed in a published opinion in favor of Sebastian. *Sebastian*, 95 Wn. App. at 123. The Department petitioned this court for review, which we granted.

## ANALYSIS

The amount of compensation a crime victim is entitled to under the Act is determined by chapter 51.32 RCW of the Industrial Insurance Act, with some specific omissions. *See* RCW 7.68.070. That calculation is not at issue in this case, as the parties agree Sebastian has $43,788.54 in injuries. However, the Legislature limited the total compensation to be awarded crime victims by two provisions of the Act. First, there is a $30,000 statutory cap. RCW 7.68.070(13). Second, the award will be reduced by certain other compensatory payments. This reduction is set out in RCW 7.68.130, which states in relevant part:

(1) Benefits payable pursuant to this chapter shall be reduced by the amount of any other public or private insurance available . . . .

. . . .

(3) Payment by the department under this chapter shall be secondary to other insurance benefits . . . .

RCW 7.68.130.

To resolve this case, we must determine the definition of

"benefits payable." The Department's question of whether "benefits payable" means the statutory cap or the amount of loss calculated under Title 51 RCW was answered by this court in *Standing v. Department of Labor & Industries*, 92 Wn.2d 463, 598 P.2d 725 (1979). However, the issue decided in *Standing* was whether the equal protection clause of the Fourteenth Amendment to the United States Constitution allowed benefits under the Act to be reduced by *any* outside compensation. *Standing*, 92 Wn.2d at 467. This court found such reductions to be constitutional. *Standing*, 92 Wn.2d at 469. *Standing* offers little guidance in resolving the statutory interpretation question presented here.

Sebastian's reading of this statute is reasonable. Since the statute directs the total damages be calculated pursuant to chapter 51.32 RCW, it is reasonable that the total damages *would* be the amount awarded but for the statutory cap and the reduction for other benefits. The Department's reading of this statute is also reasonable. Since the statute limits payment, *more* damages will not be payable.

Since both the Department's and Sebastian's interpretations of "benefits payable" are reasonable, we find the statute ambiguous. *See In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 778, 903 P.2d 443 (1995) (holding statutes susceptible to more than one interpretation ambiguous). As the Court of Appeals noted, the Act is "patently remedial." *Sebastian*, 95 Wn. App. at 125; *Haddenham v. State*, 87 Wn.2d 145, 148, 550 P.2d 9 (1976). We interpret the coverage provisions of remedial statutes broadly, and the limitations on coverage narrowly. *Peninsula Sch. Dist. No. 401 v. Pub. Sch. Employees*, 130 Wn.2d 401, 407, 924 P.2d 13 (1996). While the question here is not squarely the scope of a coverage provision, the principle can be applied by analogy, especially since determining which methodology the Legislature intended functions like a determination of the scope of coverage. Further, a remedial statute is construed broadly to accomplish its purpose: here, assuring at least a minimum level of compensation for crime victims through a combination of insurance and Act sources. *Stand-*

*ing*, 92 Wn.2d at 466. While neither interpretation fully compensates Sebastian, the liberal interpretation comes nearly $8,000 closer. The liberal interpretation is consistent with Sebastian's contention that the calculation under RCW 7.68.130 begins with his damage total as determined under chapter 51.32 RCW. *See also* RCW 51.12.010 (the Industrial Insurance Act "shall be liberally construed").

■ Further, when interpreting ambiguous statutes, we attempt to give force to the intent of the Legislature, considering the act as a whole and any other materials that illuminate legislative intent. *Sehome*, 127 Wn.2d at 778. Unfortunately, as the Court of Appeals noted, "the legislative intent is not readily apparent, either from the language of the Act or its legislative history." *Sebastian*, 95 Wn. App. at 125. Clearly, there was an intent to compensate crime victims; clearly there was an intent to contain costs. Beyond that, the history gives little guidance, and neither principle answers the question here.

■ We, therefore, conclude "benefits payable" as used in RCW 7.68.130(1) refers to the benefits calculated under the Act, incorporating by reference the benefits schedules laid out in the Industrial Insurance Act. Since we find "benefits payable" refers to the damages as calculated under the Act, it follows that "[b]enefits payable . . . shall be reduced by the amount of any other public or private insurance available . . . ," RCW 7.68.130(1), and requires that after the determination of damages, insurance benefits (such as the $7,788.54 at issue here) shall be deducted. The statutory cap is then applied. RCW 7.68.070(13).

This liberal interpretation is also consistent with RCW 7.68.130(3), which states: "[p]ayment by the department under this chapter shall be secondary to other insurance benefits . . . ." While the Act does not function like an insurance provider, it is reasonable the Legislature intended the statute to be interpreted according to principles similar to those governing the interplay between primary and secondary insurance policies. Secondary insurance pays when the primary insurance does not cover all of the

damages suffered and is available for the difference between the primary insurance coverage limits and the secondary insurance coverage limits. *See generally* 8A JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 4909 (1981 & Supp. 2000). By analogy, the Social Security compensation functions like the primary insurance; the Act's benefits function like the secondary insurance; and the statutory cap functions like the secondary insurance coverage limits. As the Court of Appeals observed, "[w]e find no support for the proposition that the amount paid under the primary coverage must be deducted from the limits of the secondary insurer's obligation to pay." *Sebastian*, 95 Wn. App. at 126. Therefore, the statutory cap functions like a coverage limit, and not like a substitute for the actual damages suffered.[1]

We affirm the Court of Appeals and remand for further proceedings consistent with this opinion. Pursuant to RCW 51.52.130, we grant Sebastian attorney's fees.

GUY, C.J., and SMITH, ALEXANDER, SANDERS, and IRELAND, JJ., concur.

TALMADGE, J. (dissenting) — The majority opinion, in agreeing with the Court of Appeals, imports ambiguity into the statutory design of the crime victims' compensation act (Act), chapter 7.68 RCW, and reaches a result plainly unintended by the Legislature. I respectfully dissent.

A. Background

RCW 7.68.070(6) states:

> The benefits established in RCW 51.32.080 for permanent partial disability shall be the benefits obtainable under this chapter, and provisions relating to payment contained in that section equally apply under this chapter.

---

[1] We decline to reach the Department's argument that affirming the Court of Appeals will obligate the Department to overspend its funds. This issue was raised for the first time in the Department's motion for reconsideration filed with the Court of Appeals and, therefore, there is no record before this court upon which to review this claim.

Further in the same section, however, the statute places a limitation on the "benefits obtainable." RCW 7.68.070(13) states:

> Except for medical benefits authorized under RCW 7.68.080, *no more than thirty thousand dollars shall be granted* as a result of a single injury or death, except that benefits granted as the result of total permanent disability or death shall not exceed forty thousand dollars.

(Emphasis added.) Thus, even though the benefits under the Act are initially determined by reference to the Industrial Insurance Act (IIA), Title 51 RCW, they are then immediately capped by the statute.

A clear reading of the Act shows the Legislature placed stringent restrictions on the benefits allowable under the Act. In *Standing v. Department of Labor and Industries*, 92 Wn.2d 463, 465, 598 P.2d 725 (1979), we noted that although the amount of compensation awarded crime victims is "related to the level of benefits available to an injured worker under RCW Title 51," the Act "modifies the award to a certain extent." For example, the Act is not intended to be a primary insurer: "Payment by the department under this chapter shall be *secondary* to other insurance benefits . . . ." RCW 7.68.130(3) (emphasis added). In addition, the statute specifically limits the amount of compensation available. RCW 7.68.070(13) ("no more than thirty thousand dollars shall be granted as a result of a single injury or death"). In *Standing*, we further acknowledged this benefit cap when we stated:

> although the legislature intended to assist and compensate victims of crime, it clearly evidenced a desire to insure only a basic level of recompense. . . . the Act insures that the victim will receive at least a *minimum* level of monetary compensation.

*Standing*, 92 Wn.2d at 469 (emphasis added).

However, what is at issue in this case is the *operative* effect of the $30,000 benefit cap established in RCW 7.68.070(13) and whether the cap applies to the entire

amount obtainable by the victim without regard to the statutory cap, or whether it sets the maximum amount recoverable prior to any offset. The parties take contrary positions regarding application of this cap. Sebastian argues the "benefits obtainable" under the Act and the IIA are the *total* amount of benefits to which he is entitled prior to any offset or lien without regard to the $30,000 cap. For example, Sebastian had $43,788.54 in damages; thus, he argues he is entitled to the entire amount, minus the $7,800 social security offset, for a total of $35,988.54. That is the amount the Department of Labor and Industries (Department) would be responsible for paying were it not for the $30,000 benefit cap, leaving him with $5,988.54 in uncompensated damages. In contrast, under the Department's approach, the $30,000 cap is the starting point from which any offset must be applied, notwithstanding Sebastian's actual amount of damages. Thus, Sebastian's maximum damage award would be the $30,000 cap, minus the previously paid offsets of $7,788.54, leaving the Department responsible for the remaining $22,211.46.

B. Statutory Interpretation

A straightforward reading of RCW 7.68.130 reveals the correct approach to determining benefits under the Act. The first sentence of RCW 7.68.130(1) says: "Benefits payable pursuant to this chapter shall be reduced by the amount of any other public or private insurance available." The key words are "benefits payable pursuant to this chapter." "This chapter" means chapter 7.68 RCW. Thus, our task is to identify the benefits payable pursuant to chapter 7.68 RCW.

The right to benefits, the amount of benefits, and the *limitations on benefits* are all set forth at RCW 7.68.070. Thus, RCW 7.68.070 determines the benefits payable under chapter 7.68 RCW. Initially, the benefits available to a crime victim depend upon the nature of the injuries the crime victim sustained, i.e., death, permanent disability, permanent partial disability, etc. *See* RCW 7.68.070(4) (death); 7.68- .070(5) (permanent total disability); 7.68- .070(6) (permanent partial disability). These amounts

are calculated according to the schedules set forth in the IIA, chapter 51.32 RCW.

Sebastian suffered a permanent partial disability as the victim of a crime, so we turn to RCW 7.68.070(6) to determine what benefits he is entitled to: "The benefits established in RCW 51.32.080 for permanent partial disability shall be the benefits obtainable under this chapter, and provisions relating to payment contained in that section equally apply under this chapter." We look to RCW 51.32.080 to determine what benefits Sebastian may obtain.

RCW 51.32.080 sets forth the schedule of payments for permanent partial disabilities there described in terms of losses by amputation. For instance, loss by amputation of the great toe at the metatarsophalangeal joint is due compensation of $6,804.00. RCW 51.32.080(1). For injuries other than amputations, the statute provides:

> Compensation for any other permanent partial disability not involving amputation shall be in the proportion which the extent of such other disability, called unspecified disability, shall bear to the disabilities specified in subsection (1) of this section, which most closely resembles and approximates in degree of disability such other disability, and compensation for any other unspecified permanent partial disability shall be in an amount as measured and compared to total bodily impairment.

RCW 51.32.080(3)(a). Sebastian's injuries totaled $43,788.54, as determined according to RCW 51.32.080. This amount is the "benefits obtainable" under RCW 7.68.070(6). But that is not the end of the story.

Once Sebastian's "benefits obtainable" are established under RCW 7.68.070(6), the next step in the determination of what is actually *payable* to him is to move forward in the same section of the Act to RCW 7.68.070(13), which provides a cap on the "benefits obtainable": "Except for medical benefits authorized under RCW 7.68.080, no more than thirty thousand dollars shall be granted as a result of a single injury or death, except that benefits granted as the

result of total permanent disability or death shall not exceed forty thousand dollars." Thus, notwithstanding what the amount determined under RCW 51.32.080, under the Act, someone like Sebastian with a permanent partial disability may not receive more than $30,000. Plainly, at this point, the "benefits payable [to Sebastian] pursuant to this chapter [chapter 7.68 RCW]" are $30,000.[2]

But the Legislature added language further in the chapter to reduce that amount by the amount of any collateral sources of payment available to a crime victim:

> Benefits payable pursuant to this chapter shall be reduced by the amount of any other public or private insurance available, less a proportionate share of reasonable attorneys' fees and costs, if any, incurred by the victim in obtaining recovery from the insurer. Calculation of a proportionate share of attorneys' fees and costs shall be made under the formula established in RCW 51.24.060. The department or the victim may require court approval of costs and attorneys' fees or may petition a court for determination of the reasonableness of costs and attorneys' fees.

RCW 7.68.130(1). In Sebastian's case, he had already received time-loss compensation from the Social Security Administration of $7,788.54. Thus, this amount has to be subtracted from his "[b]enefits payable pursuant to this chapter,"—$30,000—to reach the amount of compensation to which he is entitled under the Act, $22,211.46. Here, Sebastian received a total of $30,000 from the combination of payments from Social Security and the Act.[3]

The proper protocol for determining a compensation award under the Act is simply to follow the statute in the order it is written. First, referring to RCW 7.68.070, the

---

[2] If Sebastian's damages had been less than $30,000, of course, the statutory cap would not apply.

[3] Our "collateral source rule" against the admissibility of evidence regarding collateral sources of compensation to a tort victim does not apply here, of course. Compensation under the Act is a matter of legislative grace, and the Legislature may condition that compensation any way it sees fit. *See Standing v. Dep't of Labor & Indus.*, 92 Wn.2d 463, 598 P.2d 725 (1979) (upholding Act against equal protection challenge).

"benefits obtainable" under the IIA must be determined. Then, moving forward to RCW 7.68.070(13), the $30,000 cap must be imposed, if necessary.[4] This amount is then the "[b]enefits payable pursuant to this chapter." Finally, moving still further forward to RCW 7.68.130, the statute requires subtraction from the "benefits payable" of whatever collateral sources may have been available to the crime victim. After that subtraction, the remainder is what the crime victim receives under the Act.

The fallacy in the approach of the Court of Appeals and majority is to equate the phrase "benefits payable," which first appears in RCW 7.68.130, with the determination of the "benefits obtainable" under RCW 7.68.070. The "benefits obtainable" are not the "benefits payable pursuant to this chapter" until they have been capped by the limitations imposed at RCW 7.68.070(13).

C. Agency Interpretation

Both the Court of Appeals and the majority declare the statute ambiguous but then both ignore our rule of deference for dealing with an ambiguous statute when an agency of the executive branch of government has been interpreting the statute:

> Whether an agency's construction of the statute is accorded deference depends on whether the statute is ambiguous. Where an agency is charged with the administration and enforcement of a statute, the agency's interpretation of an *ambiguous* statute is accorded great weight in determining legislative intent. . . . Absent ambiguity, however, there is no need for the agency's expertise in construing the statute.

*Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 628, 869 P.2d 1034 (1994) (citations omitted). Thus, while we always retain the authority to decide the meaning of a statute when there is no ambiguity in it, when there is ambiguity, we defer to the interpretation of the agency charged with administering the statute, particu-

---

[4] The cap is $40,000 in the case of total permanent disability or death. RCW 7.68.070(13).

larly where there is, as here, a long-standing agency interpretation:

> The primary foundation and rationale for this rule is that considerable judicial deference should be accorded to the special expertise of administrative agencies. Such expertise is often a valuable aid in interpreting and applying an ambiguous statute in harmony with the policies and goals the legislature sought to achieve by its enactment. At times, administrative interpretation of a statute may approach "lawmaking," but we have heretofore recognized that it is an appropriate function for administrative agencies to "fill in the gaps" where necessary to the effectuation of a general statutory scheme. *See Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 500 P.2d 540 (1972). It is likewise valid for an administrative agency to "fill in the gaps" via statutory construction—as long as the agency does not purport to "amend" the statute.

*Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975). *Accord Spokane County Health Dist. v. Brockett*, 120 Wn.2d 140, 155, 839 P.2d 324 (1992); *Mall, Inc. v. City of Seattle*, 108 Wn.2d 369, 378, 739 P.2d 668 (1987). The agency is obviously not amending the statute by its interpretation. The Court of Appeals and the majority have disagreed with the Department of Labor and Industries' and the Board of Industrial Insurance Appeals' interpretation of the statute without even referring to our rule of construction, according great weight to an agency's interpretation when a statute is ambiguous. This is error. We are not writing on a clean slate when we attempt to resolve an allegedly ambiguous statute that an administrative agency as well as a quasi-judicial agency has already interpreted.

The United States Supreme Court follows the same rule of deference, and has described its rationale explicitly:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) (footnotes omitted).[5] The Supreme Court earlier this year explicated the *Chevron* rule: "Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159, 120 S. Ct. 1291, 1314, 146 L. Ed. 2d 121 (2000); *accord Lujan-Armendariz v. Immigration & Naturalization Serv.*, 222 F.3d 728, 749 (9th Cir. 2000) ("*Chevron* deference is predicated on the assumption that a statute's ambiguity constitutes an 'implicit delegation' to the agency to interpret the statute.").

Here, the Department and the Board have interpreted the Act the Legislature directed it to administer. That interpretation is entitled to great weight when the statute is ambiguous. The majority holds the statute to be ambiguous, but rather than deferring to the Department, interprets the statute as it sees fit. Such an approach is contrary to our well-settled rule of deference. *City of Pasco v. Pub. Employment Relations Comm'n*, 119 Wn.2d 504, 509, 833 P.2d 381 (1992) ("In view of the ambiguity in the statute, we accord the agency interpretation great weight in determining legislative intent."). As the Supreme Court has said: "It is enough to observe that the well-reasoned views of the

---

[5] The rule enunciated in this case is now widely referred to as "*Chevron* deference." *See, e.g.*, Curtis A. Bradley, Chevron *Deference and Foreign Affairs*, 86 Va. L. Rev. 649 (2000).

agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Bragdon v. Abbott*, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40, 65 S. Ct. 161, 89 L. Ed. 124 (1944)).[6]

D. Legislative History

Additionally, our rules of statutory construction require us to effectuate the intent of the Legislature. *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996). The majority suggests the Act should be construed liberally as it is a remedial statute. The majority, however, confuses the Act with the IIA. Unlike the IIA, the Act contains no language to suggest we should liberally construe the Act in favor of the claimant. *But see* RCW 51.12.010 ("This title shall be liberally contrued . . . ."). Nonetheless, as a remedial statute, the Act is "entitled to a liberal construction to effect its *purpose.*" *Peninsula Sch. Dist. No. 401 v. Pub. Sch. Employees*, 130 Wn.2d 401, 407, 924 P.2d 13 (1996) (emphasis added); *see also Haddenham v. State*, 87 Wn.2d 145, 148, 550 P.2d 9 (1976) (noting the statute is "patently remedial"). Thus, we should liberally construe the Act to effect its purpose—ensuring a *minimum* level of compensation for crime victims for a maximum number of recipients. Far from being an entitlement program, as that term is commonly understood, the Act provides limited compensation to crime victims as a matter of legislative grace.

When dealing with an ambiguous statute, we have looked to legislative bill reports and fiscal summaries to determine the Legislature's intent. *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 969-70, 977 P.2d 554 (1999); *Young v. Estate of Snell*, 134 Wn.2d 267, 280, 948 P.2d 1291 (1997). Contrary to the Court of Appeals, *Sebastian v. Department of Labor &*

---

[6] The rule the majority relies upon requires construing ambiguous, remedial statutes liberally. That rule, while applicable in general, does not apply here because an agency has interpreted the ambiguous statute and we should accord deference to the agency interpretation, unless it is plainly wrong.

*Industries*, 95 Wn. App. 121, 125, 974 P.2d 374 (1999), the legislative history of the Act reveals a desire on the part of the Legislature to be conservative about the calculation of benefits. In fact, a review of the pertinent history clearly shows fiscal concerns drive the Legislature's implementation and oversight of the Act. The Act was originally enacted in 1973. LAWS OF 1973, 1st Ex. Sess., ch. 122, § 1, and was technically repealed in 1981. LAWS OF 1981, 1st Ex. Sess., ch. 6, § 26 (limiting the award of benefits to those victims injured as a result of a criminal act committed *prior to* the effective date of the 1981 act). In 1982, Second Substitute House Bill 828 reinstated application of the program to all qualifying victims. LAWS OF 1982, 1st Ex. Sess., ch. 8, § 2. One effect of this substitute bill was to cap the *maximum* nonmedical benefits obtainable at $15,000. LAWS OF 1982, 1st Ex. Sess., ch. 8, § 2. *See* House Comm. on Ethics, Law and Justice Note, First Substitute H.B. 828 ("Digest of Proposed 1st Substitute") ("Specifies nonmedical *benefit limit* of $15,000 for a single injury or death.") (emphasis added). More specifically:

> The essential difference between the former crime victims benefit format and the one proposed in SHB 828 is that the latter would limit the amounts that could be paid both in the aggregate and for selected benefit categories. . . . The following are the principal benefit changes the proposed legislation would make—
>
> . . . .
>
> (b) No more than $15,000 for all benefits in the aggregate, medical benefits excepted[.]

Fiscal Note, SHB 828 (Feb. 9, 1982), at 1.

Later, one proposed amendment attempted to increase the cap from $15,000 to $70,000, but did not pass. Engrossed Second Substitute S.B. 6259. Instead, the Legislature amended the cap from $15,000 to $30,000. LAWS OF 1990, ch. 3, § 502. *See also* Final B. Rep., 2SSB 6259, at 6 ("Three different *statutory limits* on crime victims' compensation awards are increased. The *limit* on recovery for a single injury or death is increased from $15,000 to $30,000.") (emphasis added). The language in these bills

and reports clearly suggests the Legislature intended to limit a victim's recovery to $30,000, regardless of the actual amount of damages suffered by the victim.

The legislative history of the Act continually reflects the Legislature's fiscal concerns. For example, in a memorandum from Bill Perry, Legislative Staff Counsel, to Representative Earl Tilly, Mr. Perry recommends vetoing a portion of House Bill 828 because of "[t]he problem of claims overwhelming revenue without the split effective dates[.]" Memorandum at 2 (Mar. 25, 1982) (on file with Office of Program Research, House of Representatives). In addition, when the Act was reinstated, the Legislature included a new section (10), which stated:

*NEW SECTION.* Sec. 10. The intent of the legislature is that the victim of crime program will be self-funded. Toward that end, the department of labor and industries shall not pay benefits beyond the resources of the account.

Second Substitute H.B. 828, 47th Leg., 1st Spec. Sess. § 10 (1982). Inclusion of this section attests to the Legislature's concern with overspending its annual appropriations.

E. Policy

The reason for deferring to the agency interpretation in this case is precisely because the policy at issue here is not resolvable as a rule of law. While the approach of the majority benefits Sebastian, it also acts as a detriment to other potential crime victims. The money the Legislature allocates for the Act is finite. *See, e.g.,* LAWS OF 2000, 2d Spec. Sess., ch. 1, § 217(1)-(3) (budget appropriation for crime victims compensation program). Moreover, the Legislature recognized the limited availability of funding in 1982: "The intent of the legislature is that the victim of crime program be self-funded. Toward that end, the department of labor and industries shall not pay benefits beyond the resources of the account." LAWS OF 1982, 1st Ex. Sess., ch. 8, § 10 (not codified; this session law appears in the "Historical and Statutory Notes" following RCWA 7.68.035). Similarly, the Legislature more recently recognized a short-

fall in the amount of money available to pay survivors of those killed by a criminal act: "The legislature finds that current funding for county victim-witness advocacy programs is inadequate." Laws of 1996, ch. 122, § 1 (providing increased sources of funding for families of those killed as a result of a criminal act) (not codified; this session law appears in the "Historical and Statutory Notes" following RCWA 7.68.035).

If Sebastian and those in his circumstances get more, others get less or perhaps nothing. To illustrate this point, the Department asserts the majority's interpretation of the Act, "considering the time loss compensation, permanent partial disability and pensions portions of the Act alone, would result in an estimated shortfall of 4.7 million dollars per biennium," 19 percent more than the Legislature appropriated to the Act in this year's budget. Pet. for Review at 15.[7] The majority approach is beneficial to those who make their claims early while there is still money in the compensation fund, but hurts those who come later. The majority construes the statute liberally to Sebastian's benefit, but construes it illiberally to the detriment of others. The interpretation of this statute is purely a question of public policy, and we should defer to the popular branches of our state government to resolve it.

In conclusion, the proper approach is to follow the statutory design sequentially, as the statute was written. First determine the compensation award by referring to the schedules in the IIA. Then apply the statutory cap, if necessary. These two steps determine the "benefits payable." Next, subtract any amount constituting a collateral source from the "benefits payable" to determine the amount due under the Act.

There is no ambiguity in the Act unless we import it. As a policy matter, the Legislature has recognized the amount of funding available for crime victims is limited. The Legislature has not declared a wish to provide an advan-

---

[7] The Department failed to cite its source for this information.

tage to those situated like Sebastian. Giving Sebastian an advantage will result in a disadvantage to others who apply for compensation when the fund has been more depleted than it otherwise would have been but for the majority's approach. I would reverse the Court of Appeals and affirm the trial court's holding.

MADSEN and BRIDGE, JJ., concur with TALMADGE, J.

Reconsideration denied February 21, 2001.