IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TRI-CITY RAILROAD COMPANY, LLC, a Washington corporation, | ) ) ) | No. 33031-1-III |
| Appellant, | ) ) ) | |
| v. | ) ) | OPINION PUBLISHED |
| STATE OF WASHINGTON, UTILITIES AND TRANSPORTATION COMMISSION, | ) ) ) ) | IN PART |
| Respondent. | ) ) | |

SIDDOWAY, J. — Since 1937, Washington law has assigned to the Washington Utilities and Transportation Commission or a predecessor commission[1] the authority and responsibility to grant or deny the right to construct, at grade, a railroad across a road, or a road across a railroad. Other than providing that the commission must require a crossing over or under grade if it is practicable to construct one, applicable statutes do not identify criteria the commission should apply in granting or denying a petition for approval of an at-grade crossing.

In this appeal, Tri-City Railroad Company, LLC (Tri-City) argues that in

---

[1] The Public Service Commission of Washington.

approving construction of an at-grade crossing over its tracks based on a broad concept of public need, the commission deviated from its statutory obligation to regulate public safety, exceeding its statutory authority.

The commission's consideration of local planning, including its consideration of the local government's economic development objectives, does not conflict with the plain language of the relevant statute. The legislature's broad authorization to the commission is most reasonably read as an implicit delegation of authority from the legislature to the commission to fill in a statutory gap. The commission's interpretation of the statute under which it operates is not unreasonable.

For that reason, and because the commission does not appear to have improperly considered illustrative evidence—and if it did, Tri-City fails to show substantial prejudice—we affirm.

## FACTS AND PROCEDURAL BACKGROUND

For a decade, the cities of Richland and Kennewick have wanted to connect Center Parkway, a street in Kennewick, with Tapteal Drive, a street in Richland. Railroad tracks have long traversed the land that must be crossed to make that connection. An at-grade (ground level) railroad crossing[2] connecting Central Parkway and Tapteal Drive has been

---

[2] RCW 81.53.010 defines "grade" crossing to mean "any point or place where a railroad crosses a highway or a highway crosses a railroad or one railroad crosses another, at a common grade." A grade separation exists where the road goes over or under the railroad tracks by means of some sort of bridge or tunnel.

2

included as an essential public facility in the two cities' comprehensive plans, and in the

Regional Transportation Plan, since 2006.

In light of risks inherent in at-grade crossings, Washington law has provided for

more than a century that "[a]ll highways and extensions of highways hereafter laid out

and constructed shall cross existing railroads by passing either over or under the same,

when practicable, and shall in no instance cross any railroad at grade without authority

first being obtained from the commission to do so." LAWS OF 1913, ch. 30, § 2, presently

codified at RCW 81.53.020. An exemption, not applicable here, is provided for

construction of at-grade crossings within the limits of a first-class city.[3] RCW 81.53.240.

The cities of Kennewick and Richland concluded that given the cost of constructing a

bridge or tunnel and the amount of traffic at issue, separating grades for the desired

Central Parkway crossing was impracticable.

In 2013, having resolved some issues and opposition to the proposed road

construction and railroad crossing,[4] Kennewick petitioned the commission for approval to

---

[3] While Richland is a first-class city, Kennewick is not. The crossing will be located within Kennewick's city limits.

[4] In 2011, Richland successfully negotiated with Union Pacific Railroad Company and Burlington Northern Santa Fe Railroad Company for the removal of two of the four railroad tracks that would intersect with the proposed crossing. Union Pacific and Burlington Northern had joined Tri-City in opposing an unsuccessful 2006 petition by the cities for approval of an at-grade crossing at the same location. With relocation of the two tracks, the 2013 petition sought an at-grade crossing of half as many tracks and faced opposition by only one railroad.

construct an at-grade crossing at the location. It proposed to install advanced signage, flashing lights, an audible bell, automatic gates, and a raised median strip designed to prevent drivers from going around lowered gates. The city of Richland intervened, supporting Kennewick's position.

The at-grade crossing would be constructed across two active tracks that Tri-City leases from the Port of Benton and that it uses, along with a short, parallel spur, for switching and storing rail cars. Tri-City opposed Kennewick's petition, arguing the crossing would interfere with its operations.

The petition was initially heard by an administrative law judge (ALJ). The parties to the proceeding were the cities of Kennewick and Richland, Tri-City, and commission staff, which supported the petition. After receiving pre-filed testimony from the parties, the ALJ conducted a two-day evidentiary hearing. He conducted a public comment hearing following the conclusion of the evidentiary hearing, in which three members of the public testified, all favoring the project. Written public comments were accepted for several additional weeks.

Among evidence submitted by the cities was pre-filed testimony of Richland's Development Services Manager, explaining and attaching the transportation and capital facilities elements of the city's comprehensive plan and relevant portions of the Benton-Franklin Council of Government's Regional Transportation Plan. Kennewick's comprehensive plan was offered and admitted during the evidentiary hearing. Also

4

admitted was a March 2013 traffic study prepared by J-U-B Engineers (JUB), which was self-described as "summariz[ing] existing conditions, transportation need and benefit for the project" in addition to providing traffic forecasts and making recommendations. Clerk's Papers (CP) at 92. The cities offered pre-filed testimony of a railroad safety engineer, who testified that "[t]he railroad signal technology proposed to be used at Center Parkway will be the most current automatic warning system available today." CP at 1518.

Notwithstanding this other evidence, "[t]he [c]ities' almost exclusive focus" in its presentation of evidence (as later found by the commission) was "on improved response times for first responders." CP at 642. The cities' principal reliance on the comprehensive plans and regional transportation plan was for their *legal* argument that because the Growth Management Act (GMA), chapter 36.70A RCW, requires them to adopt and implement comprehensive plans and requires state agencies to comply with local governments' comprehensive plans, the inclusion of the crossing in their comprehensive plans "mandated" approval of the Center Parkway crossing. CP at 412.

The ALJ entered his initial order for the commission in February 2014, finding that Kennewick failed to demonstrate sufficient public need to outweigh the inherent risks presented by the proposed at-grade crossing, and denying its petition. He rejected the cities' GMA-based argument, observing that "[t]aken to its logical end point, the [c]ities' argument would require the [c]ommission to approve any at-grade crossing

5

planned for in a local jurisdiction's comprehensive planning process." CP at 441-42.
The cities petitioned for administrative review by the commissioners.

On review, the three-member commission unanimously rejected the ultimate
conclusion of the initial order and granted Kennewick's petition. Like the ALJ, the
commissioners found that improved emergency response time "does not weigh
persuasively against even the demonstrated low level of 'inherent risk' at the proposed
crossing." CP at 642. But the commissioners concluded that while the ALJ properly
rejected the argument that local government planning under the GMA effectively trumps
the commission's obligation to regulate public safety at rail crossings, he erred by ending
his discussion of local comprehensive planning on that basis. They reasoned that chapter
81.53 RCW and the GMA do not conflict and "the integrity of both statutes within the
overall statutory scheme is preserved by reading the GMA together and in harmony with
RCW 81.53." CP at 636. They went on to analyze how "harmony should be achieved in
the context of the facts presented in this case." CP at 636-37.

After citing heavily to the JUB Traffic Study; discussing the need, as a matter of
policy, to give some deference to the cities' transportation and land use planning goals;
and citing to the comments submitted by five members of the public, the commission
concluded:

> [C]onsidering evidence the parties largely ignored that shows additional
> public benefits in the form of enhanced economic development
> opportunities, and considering the broader public policy context that gives a

6

> degree of deference to local jurisdictions in the areas of transportation and land use planning, we determine that the Cities' petition for administrative review should be granted and their underlying petition for authority to construct the proposed at-grade crossing should be approved.

CP at 642-43.

Tri-City petitioned for reconsideration, arguing that the commission's consideration of economic and public policy interests was improper. The commission denied reconsideration, pointing out that it had not deferred to the cities on the issue of safety, but only gave "some weight to the [c]ities' transportation and urban development planning when evaluating the issue of public need." CP at 708; *and see* CP at 709 (stating that the only discussion of deference in the final order "bears no relation whatsoever to our weighing of the evidence concerning the balance between claimed improvements in public safety and the inherent or demonstrated risk of an accident at the proposed crossing").

Tri-City petitioned for judicial review. The superior court affirmed the commission's final order. Tri-City appeals.

## ANALYSIS

Tri-City contends the ALJ correctly construed the commission's statutory authority when he concluded that without a net improvement in public safety—in this case, the cities' unproven contention that emergency response times would be improved—Kennewick's petition for an at-grade crossing must be denied. Its first two

7

assignments of error are related: it contends, first, that the commission had no statutory authority to consider economic development interests, deference to local government, and the broader public policy environment in determining whether to grant or deny Kennewick's petition; and second, that the commission violated precedent when it found that those factors alone, without improvement to public safety, could outweigh the hazards inherent in at-grade crossings.

Tri-City's third assignment of error is to an asserted violation by the commission of its procedural rules when it considered five public comments as substantive evidence without notice and an opportunity for cross-examination.

We first address Tri-City's first and second assignments of error, which raise issues of statutory construction and the significance, if any, of prior judicial and commission decisions. We then turn to its arguments that the commission violated its own procedural rules.

I. Do the relevant statutes reflect a legislative intent that improvement in public safety is the essential criterion for approving at-grade crossings?

*Standard of review and principles of construction*

RCW 34.05.570(3) governs judicial review of agency orders in adjudicative proceedings. *Chi. Title Ins. Co. v. Office of Ins. Comm'r*, 178 Wn.2d 120, 133, 309 P.3d 372 (2013). In reviewing an agency order, this court applies "the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior

8

court." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 45, 959 P.2d 1091 (1998). Under RCW 34.05.570(3), judicial relief from an agency order is available in nine enumerated circumstances. Tri-City's first two assignments of error implicate two: that "[t]he order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law," RCW 34.05.570(3)(b); and "[t]he agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(d). We review challenges based on subsections (b) and (d) de novo. *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011).

As always in interpreting a statute, "[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Id.* at 9-10. To determine the plain meaning of the statute, the court looks "to the text of the statutory provision in question, as well as 'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010) (quoting *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). "If the statutory language is susceptible to more than one reasonable interpretation, then a court may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007).

9

Where a statute dealing with an administrative agency's duties and operations is ambiguous, we must also consider the possibility that a statute's ambiguity constitutes an implicit legislative delegation to the agency to fill in the statutory gaps. *See Sebastian v. State*, 142 Wn.2d 280, 293, 12 P.3d 594 (2000) (Talmadge, J., dissenting) (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000)). While an agency's action must be confined to its legislatively-granted powers,[5] "it is an appropriate function for administrative agencies to 'fill in the gaps' where necessary to the effectuation of a general statutory scheme," including through statutory construction. *Hama Hama Co. v. Shorelines Hr'gs Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975). This includes "determin[ing] specific factors necessary to meet a legislatively mandated general standard." *Tuerk v. Dep't of Licensing*, 123 Wn.2d 120, 125, 864 P.2d 1382 (1994) (citing *Asarco, Inc. v. Puget Sound Air Pollution Control Agency*, 51 Wn. App. 49, 751 P.2d 1229 (1988)).

*Statutory language*

Tri-City's "plain language" argument that the commission lacked a statutory basis for considering factors such as economic development interests, deference to local

---

[5] Because "'[a]dministrative agencies are creatures of the legislature without inherent or common-law powers,'" they may exercise only those powers expressly granted to them and those necessarily implied from their statutory delegation of authority. *Human Rights Comm'n v. Cheney School Dist. No. 30*, 97 Wn.2d 118, 125, 641 P.2d 163 (1982) (quoting *State v. Munson*, 23 Wn. App. 522, 524, 597 P.2d 440 (1079).

10

government, and broader public policy environment is that none of those are identified as criteria in the grade crossing statutes. Of course, improved public safety does not appear as a statutory criterion either.

RCW 80.01.040 prescribes the general powers and duties of the commission, which is required to "[r]egulate in the public interest, as provided by the public service laws, all persons engaging in the transportation of persons or property within this state for compensation." RCW 80.01.040(2). RCW 81.53.020 and .030 govern the more particular issue of grade crossings.

Under RCW 81.53.030, when a local authority wishes to construct a new at-grade railroad crossing, it must petition the commission, "setting forth the reasons why the crossing cannot be made either above or below grade." The statute requires the commission to investigate; give notice to affected railroad companies, local governments, or state agencies; and reduce the evidence introduced to writing. At that point,

> If [the commission] finds that it is not practicable to cross the railroad or highway either above or below grade, the commission shall enter a written order in the cause, either granting or denying the right to construct a grade crossing at the point in question.

*Id.* It may condition authorization of an at-grade crossing on the railroad company's installing, maintaining, or implementing safety devices or means. *Id.*

RCW 81.53.020 identifies criteria to be considered in determining whether a grade

11

separation is "practicable."[6] By providing that all highways and extensions of highways "shall" cross existing railroads "by passing either over or under the same, when practicable," it also forbids construction of a grade crossing if the commission's finding is that an overhead or under crossing is practicable. The commission's duty under RCW 81.53.030 to "enter a written order . . . granting or denying the right to construct a grade crossing" is, by contrast, standardless, apart from the legislature's general grant of authority to "regulate in the public interest."

The commissioners considered a related statute to be relevant in construing the scope of public interest. Their final order discusses RCW 81.53.240, which exempts first-class cities from chapter 81.53 RCW. Observing that the exemption for first-class cities has existed since 1909, the commission concluded it reflected legislative respect for our state constitution's deference to local jurisdictions on matters deemed best left to local control. Since the legislature had determined that state regulation of crossing safety

---

[6] RCW 81.53.020 provides that "[i]n determining whether a separation of grades is practicable, the commission shall take into consideration the amount and character of travel on the railroad and on the highway; the grade and alignment of the railroad and the highway; the cost of separating grades; the topography of the country, and all other circumstances and conditions naturally involved in such an inquiry." The cities argue that the language "all other circumstances" supports the commission's consideration of economic development and local planning. Br. of Richland and Kennewick at 16-17. But consideration of "all other circumstances" takes place in determining whether a grade separation is practicable, not in deciding whether the commission will approve or deny a petition once it finds a grade separation impracticable.

12

should not trump local concerns in the case of first-class cities, the commission inferred (not unreasonably) that the legislature would expect it to give some consideration to the local concerns of those cities that are subject to the at-grade crossing approval process.

Nothing in the plain language of the pertinent statutes supports Tri-City's argument that the commission improperly considered local planning and development concerns.

### *Judicial and commission precedent*

Tri-City's principal argument for its construction of the relevant statutes is that the Washington Supreme Court has already construed the applicable statutes and found public safety paramount in two decisions, *Reines v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 195 Wash. 146, 80 P.2d 406 (1938) and *Department of Transportation v. Snohomish County*, 35 Wn.2d 247, 251, 212 P.2d 829 (1949).[7]

The earlier of the two decisions, *Reines*, was a tort case arising out of a collision between an automobile and freight train on a foggy night, at an at-grade crossing that lacked signal lights or warning devices. The complaint was dismissed for failure to state

---

[7] Tri-City also argues that commission precedent supports its construction, but it relies on two initial decisions of the commission, made by administrative law judges, which became final because they were not appealed. By commission rule, such decisions are not precedential. WAC 480-07-825(7)(c). We do not consider them further.

Tri-City argues that the commission itself relies on an initial order for the framework it applies to evaluate Kennewick's petition. We do not read the commission's final order as treating the earlier initial order as precedential. It merely recognizes the framework for evaluation in the earlier initial order as useful.

13

a claim. In holding that the complaint was not deficient for failure to allege that defendants were aware of the dangerousness of the crossing, the court stated "it is not to be supposed that anyone would *deny* that the crossing was dangerous," and "[t]he statute law of this state relating to grade crossings has for many years been based upon the theory that all grade crossings are dangerous." 195 Wash. at 150 (emphasis added). The court cited the statutory requirement for approval of at-grade crossings and the statutory preference for above or below grade crossings as examples.

*Reines* does not purport to address the criteria applied when the commission decides whether to grant or deny authority to build an at-grade crossing. The inherent danger of at-grade crossings is the theory behind the regulatory procedure for at-grade crossing approval, but that does not mean that safety will be the only consideration in allowing at-grade crossings to be built.

The second case, *Snohomish*, involved the closing of an at-grade crossing by the department of transportation, which at that time exercised the authority now held by the commission. The department's decision was appealed, and a superior court reversed it. The supreme court reversed the superior court, reinstating the department's closure.

Most relevant to this appeal, and not helpful to Tri-City, is the court's observation in its decision that under predecessor statutes, "the legislature delegated very wide powers to the public service commission with regard to railroad and highway crossings."

14

35 Wn.2d at 250.[8] Also relevant is the range of evidence the department entertained before making its decision. Notwithstanding that "all grade crossings are dangerous," the department weighed just *how* dangerous the particular crossing would be against other factors. *Id.* at 257 (internal quotation marks omitted). It considered automobile traffic flow and impact of the closure; the material volume and high speeds of train traffic at the crossing; the grade of, and visibility from, the subject road; and, finally, the "convenience and necessity of those using the crossing and whether the need of the crossing is so great that it must be kept open notwithstanding its dangerous condition." *Id.* at 254.

Tri-City nonetheless contends the following language (language from the findings of the department of transportation, not reasoning of the court) rules out economic development as a factor in granting or denying the right to construct an at-grade crossing:

> It is contended by residents of Mukilteo that the closing of this crossing would damage business property due to the fact that the closing of the crossing would result in making the north portion of Park Avenue a dead end street. The department has no jurisdiction to consider damage to property as such. Other remedies may be provided by law to compensate owners for damage to property, if any. The department may only consider whether or not convenience and necessity justifies the closing of the crossing.

*Id.* at 255 (internal quotation marks omitted).

---

[8] The statute in *Snohomish* is Rem. Rev. Stat. § 10514 (Supp. 1940), *recodified as* RCW 81.53.060. Though the particular section is not identical (here RCW 81.53.020-.030 are at issue), the statement relates to the commission's broad powers and is applicable to RCW 81.53 in general.

15

To begin with, Tri-City fails to consider the significance of the words "jurisdiction" to consider, and damage to property "as such." "Jurisdiction" in its subject matter sense used in the passage means the authority to adjudicate the type of controversy involved in the action; "[a] tribunal lacks subject matter jurisdiction when it attempts to decide a type of controversy over which it has no authority to adjudicate." *Marley v. Dep't of Labor & Indus.*, 125 Wn.2d 533, 539, 886 P.2d 189 (1994). Thus understood, and read in context with the court's discussion of damages "as such," and "other remedies . . . to compensate . . . for damage to property," the department appears to have been saying that it could consider damage to property only insofar as it bears on "whether or not convenience and necessity justifie[d] the closing of the crossing"—it could not award damages. *Snohomish*, 35 Wn.2d at 255 (internal quotation marks omitted).

More importantly, the court did not attribute any meaning to this statement by the department or endorse it as a fair application of the predecessor to RCW 81.53.030. Rather, after reciting many department findings in the grade crossing decision at issue, the court noted that the power to close grade crossings had been delegated to various commissions,

> not to the courts. . . . [W]e have consistently held that the courts should not, without grave cause, interfere with the orders of such commissions, such as the public service commission, the department of public works, or the department of transportation. In *In re Stolting*, 131 Wash. 392, 230 P. 405, the court said: "Time and again we have held that we will not interfere with the action of the department of public works on matters of this nature, unless its members have acted unfairly, arbitrarily, or in disregard of the

16

testimony. [Citing a long list of cases.] There is nothing in this case to indicate that the department did not fully consider the testimony and honestly exercise its judgment. Such being the case, there is nothing for us to do but affirm the judgment, which is done."

*Id.* at 257 (alteration in original).[9]

Tri-City's arguments based on asserted precedent are not persuasive.

*Legislative history*

The history of RCW 81.53.030 and its predecessor provisions reflects legislative balancing of local concerns. As originally adopted, the predecessor to RCW 81.53.030 accorded complete deference to a local government applicant for an at-grade crossing if the commission found an over or under crossing to be impracticable. Before 1937, the predecessor to RCW 81.53.030 stated that if the commission found that an over or under crossing was not practicable, it "shall make and file a written order in the cause, *granting the right and privilege* to construct a grade crossing." REM. 1915 CODE § 8733-3

---

[9] A third case, cited in Tri-City's reply brief, is clearly inapposite. *In re City of Seattle*, 96 Wn.2d 616, 625-26, 638 P.2d 549 (1981) is cited for the proposition that though a project may be in the "public interest," it may not constitute a "public need" if the purpose is private economic development. Reply Br. at 10. *Seattle* addresses whether, for purposes of eminent domain, private development is a public use. Neither the page that Tri-City cites, nor the majority opinion in its entirety, ever uses the term "public need." Its analysis is consistently couched in terms of "public use" and "public purpose." (Only Justice Utters uses the term "public need," in his dissent, in which he *would* find a public need for the private development).

This is not an eminent domain case.

17

(emphasis added).[10] In *State ex rel. Toppenish v. Public Service Commission*, 114 Wash.

301, 194 P. 982 (1921), the Washington Supreme Court reviewed a commission order

that had found grade separation impracticable but denied a petition on the basis that the

benefits of the at-grade crossing were "outweighed by the dangerous condition of the

proposed crossing, and other considerations." *Id.* at 303-04 (internal quotation marks

omitted). In reversing the order, the court held that under the statute, once the

commission determined that grade separation was impracticable, it became its "plain

duty" to permit the grade crossing that "city authorities [had decided] should be

established." *Id.* at 308.

The legislature responded some years later by amending the statute to provide that

if the commission found it impracticable to cross the railroad above or below grade, then

"it shall make and file a written order . . . *granting* the right and privilege to construct a

---

[10] The earliest legislation, enacted in 1909 and that delegated decision making authority to the Railroad Commission, did not contain a statutory concept of impracticability and provided in relevant part:

> If the Commission finds that it ought not to require such highway or railroad to be so constructed as to cross above or below the grade of the existing railroad or highway, it shall by resolution filed in the cause and duly entered upon its minutes, *grant the right and privilege* to construct such railroad or highway across such established railroad or highway at grade.

LAWS OF 1909, ch. 162, § 2 (emphasis added). The 1909 legislation was repealed and replaced in 1913 by legislation containing the concept of practicability and imposing a duty to grant authority to construct at-grade crossings unless they were determined to be impracticable. LAWS OF 1913, ch. 30, § 3.

18

grade crossing *or denying* the application and right to construct a grade crossing *in toto*."
LAWS OF 1937, ch. 22, § 1 (some emphasis added). Amendment to the current language
(that the commission shall enter a written order "either granting or denying the right to
construct a grade crossing at the point in question") was enacted in 1955. LAWS OF 1955,
ch. 310, § 3.

Although the 1937 change made the commission the final authority when a non-
first-class city proposes to construct an at-grade crossing, this legislative history is
consistent with the commission's inference of a legislative intent that it should consider
local interests going beyond public safety.

## *Construction*

Considering all, by broadly charging the commission to "regulate in the public
interest" and assigning it the standardless authority and responsibility to grant or deny
petitions for at-grade crossings, the legislature implicitly delegated to the commission the
responsibility to interpret "public interest" in the first instance. We will not substitute our
construction of the statute for a reasonable interpretation by the commission. *Hama
Hama*, 85 Wn.2d at 448. The commission's construction of its charge and of the breadth
of "public interest" is reasonable.

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

## II. Asserted reliance on illustrative exhibits as substantive evidence

Tri-City's remaining assignment of error is that the commission violated its procedural rules when it considered five public comments as substantive evidence without notice and an opportunity for cross-examination. This assignment of error implicates another statutory circumstance in which judicial relief from an agency order is available: "The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure." RCW 34.05.570(3)(c).

Even if an agency engages in unlawful procedure, a petitioner for judicial review is not entitled to relief unless it can show that it was "substantially prejudiced by the action complained of." RCW 34.05.570(1)(d); *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 226, 173 P.3d 885 (2007). Tri-City argues that if the improperly-considered public comment is excluded, substantial evidence does not support the commission's order granting Kennewick's petition. This implicates a fourth statutory circumstance in which judicial relief from an agency order is available: "The order is not supported by evidence that is substantial when viewed in light of the whole record." RCW 34.05.570(3)(e).

We review a challenge based on RCW 34.05.570(3)(c) de novo. *Kittitas County*, 172 Wn.2d at 155. The standard we apply in determining whether the order is supported

20

by substantial evidence is whether the evidence is sufficient "'to persuade a fair-minded person of the truth or correctness of the order.'" *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000) (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)). The evidence is viewed "'in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority.'" *Affordable Cabs, Inc. v. Dep't of Emp't Sec.*, 124 Wn. App. 361, 367, 101 P.3d 440 (2004) (quoting *Schofield v. Spokane County*, 96 Wn. App. 581, 586-87, 980 P.2d 277 (1999)).

The commission's procedural rules provide:

> When a member of the public presents a document in conjunction with his or her testimony, the commission may receive the document as an illustrative exhibit. The commission may receive as illustrative exhibits any letters that have been received by the secretary of the commission and by public counsel from members of the public regarding a proceeding. Documents a public witness presents that are exceptional in their detail or probative value may be separately received into evidence as proof of the matters asserted after an opportunity for cross-examination.

WAC 480-07-490(5). Elsewhere, the commission's rules provide that such comments are "treated as an illustrative exhibit that expresses public sentiment received concerning the pending matter." WAC 480-07-498.

In its final order granting Kennewick's petition, the commission mentioned public comments by five individuals. The public comments are not exceptional in their detail or probative value and the ALJ did not invite cross-examination after receiving the comments.

Arguably, the commission considered the public comments only as expressing public sentiment on the city's proposal. We say this based on the placement in the final order of the commission's discussion of the public comments (it follows discussion of the parties' evidence) and on the language used to describe the public comments (e.g., as "underscor[ing]" the project's potential, "emphasiz[ing] community expectations," "illustrat[ing] the local importance of recognizing the broader public policy environment," and "support[ing] the proposed project"). CP at 639-42.

But the clearest basis on which to reject this challenge by Tri-City is that it has not demonstrated substantial prejudice, even if the public comments were treated as substantive evidence by the commission. Tri-City argues that it was prejudiced because if the public comments are disregarded, three of the commission's findings and conclusions are not supported by the record. We disagree.

The first finding that Tri-City argues is not supported by substantial evidence is the commissioners' ultimate finding 8, which appears at paragraph 37 of the final order:

*37* (8) The Center Parkway extension, including the proposed at-grade railroad crossing, is a long-planned and important component of the Cities' transportation system. The project will improve traffic movement between two important and growing commercial areas in Richland and Kennewick, thus promoting economic development.

CP at 644.

The fact that the Central Parkway extension is a long-planned and important component of the Cities' transportation system is supported by the JUB Traffic Study

22

("For several years the city of Richland has pursued the extension of Center Parkway to connect between Gage Boulevard on the south to Tapteal Drive on the north," CP at 92); evidence of the cities' unsuccessful 2006 petition for approval of an at-grade crossing; and the evidence that the connection had, since 2006, been included as an essential public facility in the two cities' comprehensive plans and in the Regional Transportation Plan.

The fact that the proposed crossing will improve traffic movement is supported by the JUB Traffic Study, which states that a purpose of the connection is to "[p]rovide relief to congested arterial facilities," CP at 92; and elsewhere states:

> Currently to get from the Columbia Center Mall to businesses on Tapteal Drive, traffic must make a left turn to go north on Columbia Center Boulevard, which is often congested, then proceed to go east on Yellowstone Avenue, south on Belfair Street and then proceed west on Tapteal Loop to access Tapteal Drive. With the Center Parkway connection, traffic will be able to exit the Mall area on the west side and go north at the roundabout at Gage Boulevard and proceed directly north to Tapteal Drive.

CP at 97.

The fact that the proposed crossing will connect two growing commercial areas in Richland and Kennewick, thus promoting economic development, is supported by several statements in the JUB Traffic Study including that a purpose for the connection is to "[p]rovide improved access to commercial areas and developable land," CP at 92; that, in that connection, "nearly 60 developable acres of commercial land between the railroad and SR 240 which has desirable visibility will have improved access and will gain the

23

synergy that commercial areas often seek," CP at 105; and, elaborating elsewhere on the 60 acres, that "[t]oday [the 60 acres] has all utilities and collector roadway access on Tapteal Drive, however it is not as close to the rest of the commercial areas as it could be without Center Parkway, because of the barrier created by the railroad." CP at 97.

In addition, Richland's development services manager, Rick Simon, testified that the Center Parkway connection and crossing "establishes a complete road network" and provides "significant relief to [traffic] congestion" and "improved access to developable lands." CP at 831-32. Elsewhere, he testified that it "also helps to promote economic development of the community." CP at 829. Viewed in the light most favorable to the city of Kennewick, substantial evidence supports the commissioners' ultimate finding 8.

Tri-City next challenges the record's support for the commission's mixed finding and conclusion 9, which appears at paragraph 38 of the commissioners' final order. It states:

> *38* (9) The record includes substantial competent evidence showing sufficient public need to outweigh the inherent risks presented by the proposed at-grade crossing.

CP at 644.

Given the commissioners' reasonable construction of RCW 81.53.030 as authorizing consideration of a broad concept of public need, their finding 8 supports the commissioners' conclusion that the record includes substantial competent evidence showing public need.

24

Their finding that the evidence of public need outweighs the risk presented by the at-grade crossing is supported by finding 8, and by the testimony of Susan Grabler, the railroad engineer, who testified, among other matters:

> The automatic warning devices used on all new at-grade highway-railroad crossings by all railroads along with sound traffic engineering and civil engineering design practices will provide a safe at-grade highway-railroad crossing. Especially for a crossing with 7,000 [average daily traffic] and low train volumes as proposed in this case.
> With the addition of medians on the approaches to the crossing to keep motorists from driving around the gates, the existing train speed of 35-MPH or less and the average of six trains per day, along with the most current automatic warning devices, should be sufficient to create a safe at-grade highway-railroad crossing.
> . . . .
> The railroad signal technology proposed to be used at Center Parkway will be the most current automatic warning system available today. Additionally, with the traffic and civil engineering practices employed by the City of Richland, this crossing will be designed and built to provide the public a safe at-grade crossing as well as providing the public the convenience they have sought at this location.

CP at 1515, 1518. Viewed in the light most favorable to the city of Kennewick, substantial evidence supports mixed finding and conclusion 9.

Finally, Tri-City challenges the commission's conclusion 10, which appears at paragraph 39 of the commissioners' final order. It states:

> *39* (10) The Commission should grant the City of Richland's and City of Kennewick's petition for authority to construct an at-grade crossing at the proposed extension of Center Parkway.

CP at 644. The conclusion follows naturally from the commission's preceding findings.

Because Tri-City has not demonstrated that it was substantially prejudiced even if

25

No. 33031-1-III
*Tri-Cities R.R. v. Util. & Transp. Comm'n*

the commission considered the public comments as substantive evidence, it is not entitled to judicial relief. RCW 34.05.570(1)(d).

## Attorney fees

Tri-City requests an award of costs and fees under RAP 18.1 and under RCW 4.84.350, which provides for an award of fees and expenses when a qualified party prevails in a judicial review of an agency action. Because Tri-City has not obtained relief on any significant issue, the statute does not apply.

Affirmed.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, A.C.J.

26